Good morning to all of you and welcome to our court. At the outset, Judge Hall and I wanted to welcome and introduce to you our visiting judge, Judge Barbara Rothstein. We are delighted to have her working with us this week and helping us with our cases. She brings a world of experience and distinction to the task. She has served for many years as a district judge in the Western District of Washington, where she was appointed by President Carter in 1980. She was the chief judge of that court for many years. She became the director of the Federal Judicial Center and she has been trying cases for a long time in many locations and we are delighted to have her join us today. We'll begin, but let me make just two very brief observations for you before we start. For those of you unfamiliar with our timing and lighting system, you'll see we've got a clock that keeps the time that you have used and there's a lighting system. Green means, of course, you may proceed. Amber is a two-minute warning. When the red light goes on, it means that your time is up and we'd be much appreciative if you could bring your remarks to a conclusion. Final observation, as you proceed with your arguments, you may safely assume that we've had a chance to review not only the briefs and the record excerpts, but in many of the instances we've had a chance to actually look at the record as well. So feel free to go right to the heart of your argument. And with that, we will proceed with the first case, which is Barrientos et al. v. CoreCivic Good morning. I'm Nicholas Aceto, counsel for the appellant CoreCivic. The question certified by the district court is whether the Trafficking Victims Protection Act applies to work programs and federal immigration detention facilities operated by private contractors. The answer to that question is no. The TVPA does not apply because the text of the statute, when construed in context, does not reach any labor in the custodial detention setting. How do we know that? Well, long before the TVPA was enacted, Congress had authorized immigration detainee labor. The INS and ICE required and extensively regulated detainee labor in its facilities, including enforcement through sanctions. And courts, including this Barrientos et al. v. Woodham, consistently recognized that certain detainee labor could be compelled while in custody. There is no evidence that Congress intended to displace that statutory and regulatory framework or supporting jurisdiction and potentially criminalize the very labor that it authorized and which is necessary to maintain a safe and secure detention environment. In fact, the thousands of pages of legislative history and the act's stated purpose. Let me just frame the question that you can help me with. It seems to me the problem that you've got to address frontally is the text itself. The text could not be clearer and could not be drafted more broadly than it is. Whoever, it says, knowingly provides or By anyone, by the following means, force violence, et cetera, shall be either guilty of a felony or the statute has a companion civil liability. The language itself, the text does not include any such limitation. It doesn't say whoever knowingly provides or obtains labor of a person except for immigration detainees involved in work programs in a institution run by the United States Immigration Service or its surrogate. It just says whoever knowingly provides. How do we write the limitation that you propose to have us read into it where Congress chose to speak so broadly? Well, there are two guiding principles that should be at the forefront of this Court's inquiry. And the first is that a court should always exercise interpretive restraint when assessing the reach of a federal criminal statute like the TVPA. The second, and this goes directly to your question, is that the meaning of statutory language, plain or not, depends on the statute's context. And as the Supreme Court recently repeated in Yates v. United States, the plainness or ambiguity of a statutory language is determined not only by reference to its text, but also by the specific context in which the language is used. Is there anything ambiguous about the text? Yes, there is. As you said yourself, Your Honor, the words could not be broader than statutory. I said the words could not be clearer in their breadth. With each of those words, Your Honor, they are also inherently broad. The words whoever, the word obtain, the word labor, those could reach any interpretation. And the point of the recent line of Supreme Court cases that we cited in our briefs is when you've got terms, when you have texts that have no limits, that could lead to an unbounded or unrestrained interpretation, that is when you need to come in and find the limitations, especially when it's involving a criminal statute. And it is the inherent broadness of those words, Your Honor, that requires the Court to look at the broader context of the statute. If you just look at the word labor, that could conceivably apply when a parent tells their teenage son to mow the lawn. But I don't think anybody in this courtroom would argue that the TVPA would criminalize that labor. Conversely, I think it's pretty clear from the cases that if you traffic a foreign national into this country and enslave them for labor, I don't think anyone would disagree that it would apply in that situation. The reason why it would apply in both situations is because the terms are so broad. And when the terms are so broad, that's when you need to delve a little bit deeper beyond the plain text and determine whether or not the context of those words apply in the particular situation. Right. But to use your example, I don't suppose anybody would seriously contend that if a mother tells her child to make her bed in the morning before she comes down for breakfast, no one would assume that that constitutes forced labor in that context. The question here is if immigration detainees are given the option of working and are otherwise while in detention and otherwise are compelled to work by means of force, threats of violence, et cetera, you've got something that looks to fall more closely within the ambit of what they're talking about, don't we? Perhaps. But I think you've pointed out the spectrum of possible interpretations. And that's our point, is when this is clear but maybe this is not as clear, that's when we've got to peel the layers back and look underneath the plain text. And to get right to your question, Your Honor, in this, if you look at the context of this statute, you've got the INA, 8 U.S.C. Section 1555D, which authorized immigration detainee labor back since the 50s. That set the footprint for this, for labor in these facilities. Then you've got the PBNDS, which regulate the labor that can occur within the facilities. And that, those standards require inmates to perform certain labor through sanctions. For example, the PBNDS require detainees to perform personal housekeeping. They must clean their immediate living areas. They also require detainees to maintain the common living areas. They must pick up after themselves. If they don't do those things, they will be sanctioned. Right. So there the debate is over the meaning of the word labor or services. But what we're talking about is the meaning of the word whoever knowingly and the meaning of a person. Those are the essential questions because the only question certified and accepted by this court in this interlocutory basis is whether the TVPA applies to work programs in Federal immigration detention facilities operated by a private for-profit organization. That's the only question before us, not the nature and extent of the services or even the difficulty of discerning the meaning of labor. Do I have that right? Well, you've accurately restated the district court certified question, Your Honor. But as you know, the court's not bound by the way that the question is certified. The order in its entirety is certified, and this court can address any issue that's material to that order. And we submit that to determine whether or not the statute applies in this narrower context of a work program, you have to first decide whether or not it applies in this custodial detention setting at all. The second to answer your the second part of your question, you can't just look at one of these words in a vacuum. You can't just look at whoever or labor or obtain. You've got to look at them collectively and in context. The word labor is tethered to whoever and obtain. So when you're talking about whoever obtains labor, you're correct. There's no explicit exception in the statute for Federal contractors or for anything related to this detention context. But we're not seeking an extension. What we're asking the court to do is to interpret those phrases, which are inherently broad, interpret that phrase in light of its context. And when you've got a longstanding statutory and regulatory framework, there's no evidence that when Congress enacted the TVPA that they intended to displace that, that they intended to, for example, criminalize conditions of confinement. If you look at the allegations in the complaint, that's what they are effectively alleging, that there was mold in a shower, that this bathroom didn't have cold water. Therefore, I had to — I felt coerced to participate in the voluntary work program. Any crafty lawyer can — can — can come up with allegations that somehow tie a condition, a detention grievance, to this TVPA and suddenly turn what would traditionally be perhaps a conditions-of-confinement claim or a State law, common law claim into criminal liability. That's what we're talking about here, criminal liability. And — and there's no evidence in the legislative history, the stated intent — the Well, but they created a civil remedy. That's the issue before us, right? Nobody's — nobody has proceeded with a criminal sanction against CoreCivic. That's correct, Your Honor. But to bring a civil suit, you must establish a criminal violation. And in answering this question, you will be setting the parameters of what does and does not constitute a crime under the TVPA. That is the ramification of this decision. It goes beyond the civil aspect. Thank you. I will reserve the rest of my time for rebuttal. Good morning. Good morning, Your Honors, and may it please the Court. My name is Andrew Freeh, and together with co-counsel at the Southern Poverty Law Center, Project South, and the law firm of Burns-Scherest, we're privileged to represent the plaintiffs at police in this action this morning. We'll get into the merits question certified by the district court, but first, we believe that it's important to revisit the question of whether this case is properly before this court. We're here on an interlocutory appeal from the district court's decision denying CoreCivic's motion to dismiss. That's supposed to be a rare and exceptional case, and there are two principal reasons, two things that we believe counsel the courts revisiting the decision to take up this interlocutory appeal. First, there has been a significant change in circumstances since both the district court issued its order and the motions panel issued its order, and that is the position of the United States. The plaintiffs believe that because the United States has weighed in on the question whether the TVPA applies to work programs in federal immigration detention facilities contracted by private prison companies, there is no longer a substantial ground for difference of opinion. There might be difference of opinion, but is that difference of opinion substantial? There's two reasons why the United States' position matters here for the question of a substantial ground of difference of opinion. First, the United States is responsible for criminally prosecuting the TVPA. The Department of Justice has been given that power by Congress. And second, CoreCivic is subject to this position by virtue of its contracts. CoreCivic could not turn around and tell the United States, you know what, we think we can force people to work under — in violation of the TVPA because it doesn't apply, and still draw revenue from the Federal Government. It draws its authority to detain people at Stewart from the United States government, and the United States government says the TVPA applies. So now we have five district courts and the Federal Government saying the same thing. So there's — that's a — Have we missed it, or has any circuit ever weighed in on this issue? This is a question of First Impression before the circuits, Your Honor. So the answer is no. The second key factor that counsels in favor of dismissing this appeal is that regardless of what this Court decides today, this case will continue in front of the district court. And that's because there is a live unjust enrichment claim that has independent Federal Catholic jurisdiction. And so if this case is supposed to materially advance the termination of the TVPA — Of course, that's true on many issues that we hear on an interlocutory basis. That's true. The mere fact that the case will go back for trial may arise in the context of when we take it up on qualified immunity, or whether we review for 23F the question of whether a class was properly certified or not, or whether there's a discrete and wholly severable issue that otherwise cannot be resolved by a court of appeals. So the mere fact that it will go back doesn't seem to me to really take us very far in answering the question here. Certainly, Your Honor. But those are not 1292B situations. No, I agree. And so moving to the merits, however, if the Court decides to reach them, the question before this Court is — But what you'd have us do is vacate the motions panel conclusion — That's correct. — that we ought to take it on an interlocutory basis and address an issue of First Amendment address by any court of appeals at this point. That's correct, Your Honor. And it's — that makes good sense, because there's so many factual issues inextricably linked to the question before the Court. If we look at, say, the reply brief from CoreCivic, you'll find 20 references to the question presented by the district court and certified, but none of them actually, except for one on page 11, actually accurately state the question. Well, really, what are the factual issues that would get in the way of this being — isn't this — None. You could — you could resolve this question today. In order to — So it is a pure question of law. It is a pure question of law. That's correct. So getting to that pure question of law — Did the DOJ intervene in the district court? I take it they didn't. They just filed their misbrief up here. That's correct, Your Honor. Yes. Okay. And it seems like they — it would be helpful to have them as a party in the district court in intervention to — because they want a holding here that you can operate a voluntary work program. Do you disagree with that, or do you think all of their work programs are bad? No, Your Honor. We do not disagree with the DOJ's position. Okay. And do you think — so our saying, as long as it's a voluntary work program, it doesn't violate the statute. In general. You agree with that? Yes, Your Honor. Do you also agree — this is what they say in their brief. If you operate it in accordance with the federal detention standards, that's regulations, the DOJ has promulgated, it also doesn't violate the statute. Do you agree with him on that? I have to quibble with the premise. I agree with the conclusion. The premise that the PBNDS, the Performance-Based National Detention Standards, are properly promulgated regulations is untrue. There are no regulations of the PBNDS. There's not even binding interpretive guidance. It would get no deference before this Court. So what are the federal detention standards? They're incorporated into contract. And so it's not actually regulatory. Of course, CIVIC is bound by them. We don't dispute that. They apply it to us. All right. Well, let me rephrase the question. Sure. Do you claim that if, in fact, the defendant here was operating this program in accordance with the standards in its contract, it would not violate the statute? Generally, yes, Your Honor. Okay. Because the government's contracting with them. That's correct. It's like, here's what you can do. I think — So the contract on its face here doesn't violate the statute. That's correct, Your Honor. And the PBNDS — So the question we're dealing with here is whether or not the conduct of the private contractor is pursuant to the contract or it's forced labor. That's exactly right. Okay. Help me with that. I'm — I guess I may be the only one confused in this courtroom. I thought the question that had been certified — we may not be limited to it, but the question that the district court asked us to review and the question that the motions panel agreed should be reviewed was this. Does the TVPA apply to work programs, as a general matter, in Federal immigration detention facilities operated by a private, for-profit contractor or corporation? You are not confused. Isn't that the discrete question? Yes, Your Honor. And what I'm sort of getting at with my question is whether a particular program, assuming arguendo, that it states a claim as a matter of law to include within the ambit of the statute these immigration detainees in a Federal facility run by a private contractor, assuming the answer to that question is yes, whether or not it violates the statute on the merits, strikes me as a distinct question. And the reason I ask it is because CoreCivic devotes some space in their brief to the additional argument that plaintiffs do no more than allege they were compelled to perform, Labor CoreCivic could require them to perform under the PBNDES, that is like personal housekeeping. Is that question before me? It is not. And it's incorrect. That statement is incorrect. So if we turn to the actual question before the court, you are not confused. That is the question we're here to address. So I'm not going to the merits of whether or not this program or how it may be run runs afoul of the statute or not. That is to say whether they coerce or they don't, although it's clear that you couldn't state a claim without alleging coercion, and you couldn't sustain a claim without proving coercion. But all I'm asking you is whether or not the program coerces is not before me or is it before me? I don't believe that's before you, Your Honor. The question before the court or certified by the district court and accepted by the Now, my friend is correct. But part of the TVA coverage question is whether the DOJ is trying to get us to whole. Part of the coverage question without getting into the merits, they say, is whether their detention facility voluntary work programs would fall within the coverage of the statute. And they say they do not fall within the coverage of the statute. Who's the DOJ? DOJ. They say their voluntary work programs do not fall within the coverage of the statute. I don't know that that's true. I think the DOJ is saying the TVPA applies to voluntary work programs. That is the DOJ's position. The confusion is you're using the word voluntary in there, which implies the judge has made a judgment already. If it were a truly voluntary program, then we would be talking about the merits. But we don't care right now before this Court whether it's voluntary or involuntary. The whole question is whether the statute applies at all to a work program. I think if you include the word voluntary, you're going to confuse us. That makes sense. I apologize. I don't know whether it applies to a detention facility run by exactly what was read to you before. The issue of whether it's voluntary or not is only going to confuse us at this point. Are you asking them to put the question as simply and directly as I can, and we'll put the question to the United States amicus in a moment. Are you asking us to rule on whether the Federal programs on the merits are voluntary programs that fall within or without the coverage of the statute? No, Your Honor. No. Okay. No. I'd like to try and synthesize the questions by both Judge Hall and Judge Rothstein if I can, and maybe respond in the process to what Gorsivik said and maybe prebut some of what the United States is going to say. Work programs in Federal immigration detention centers have a specific context. Okay? We don't need to get there because the statute, as Your Honor has observed, the language of the statute is clear. It's plain. The context around that statute is clear and plain. Congress didn't just intend to limit the TVPA and its reauthorizations to international trafficking. How do we know that? Well, let's look at 1590. 1590 makes it a crime to traffic someone. I think we're past that. Okay, good. So let's get to the background then. Okay. Then if we're going to get there. I mean, there's no limitation in the statute for international trafficking. Sure. All right. So then if we say that there has to be some background norm that allows a private prison contractor to make civil immigration detainees work without any congressional regulation, the Congress must have known about that and they wouldn't have intended to cover the TVPA. What is that? So you've seen 1555d. It's not part of the INA. It was enacted before the INA came out. And it's only for payment of allowances. It's not assuming that you can make people in custody work. I've addressed how the PBNDS is not a regulatory scheme. There's no remedial aspect of it. But here's the thing. This question got answered in the 1890s with Wong Wing. The Supreme Court said that because you don't get a jury trial, you can't get forced to work when you're a civil immigration detainee. And that background, that context is not mentioned. Congress must be presumed to have legislated when it legislated the TVPA against that background, which is that you cannot force people in civil immigration custody to do work. And so if, in fact, we're going to start looking at context to understand the words of this very plain statute, the context actually helps the plaintiffs out police. And I hope that helps advance the ball on this statutory interpretation. Well, don't we have the Channer case? We do have the Channer case. This issue was there, and they said that, in fact, you could make them work, right? I think that the question in Channer was whether the 13th Amendment would prohibit the requirement that people in civil immigration detention facilities run by the Federal Government perform certain tasks. So we actually think Channer is bad law. The better case out of the Fifth Circuit is Watson, which happened a few years before Channer. But that is neither here nor there, because here we are at the TVPA. Channer was decided before the TVPA was enacted. The TVPA, in its legislative history, which, of course, it excites, block quotes in its opening brief, says we're going to expand upon the protections that were rejected by Justice O'Connor's plurality in Kosminski. We don't think that that is broad enough to cover the harms that we believe we need to prevent in order to protect both workers and also to protect just human beings who could get pushed into forced labor like the workers in Kosminski. And so Channer is not applicable here. It is not a background norm that the Fifth Circuit could create that you can have civil immigration detainees who are confined while many of them, like our plaintiffs, are claiming fear for their lives, work to perform tasks like making 6,000 meals a day for nearly 2,000 people. Are you making a claim, I go back to your detail complaint, if they do have to clean their own areas, is that part of your complaint that that's forced labor? No. That they have to do cleaning of? It is not. Okay. If I go through a complaint, I won't see any allegation about cleaning their own, making their own beds. No. Cleaning their own. No, Your Honor. The performance-based national detention standards, I see my time is almost up. Can I just finish this answer? Sure. Okay. The performance-based national detention standards set forth four required personal housekeeping tasks in your immediate living area. One is the example that Judge Marcus gave. You have to make your bed every day. Second, you have to keep the area. And these standards are in the contract. That's correct. And is the contract in the record? It is referenced by — it is incorporated by reference into the complaint, and I believe the district judge relies on it. And I don't think any party would believe that the contract — and I think the United States has actually come in and said that this — Okay. It's incorporated by reference, but is it attached to it so we can see what the four performance standards are? Oh, so the contract is — excuse me. The performance-based national detention standards are incorporated by reference into the contract. They're not attached. We have several references in our brief, the United States references in their brief, the performance-based national detention standard. They're in the record. They're available online. They're subject to — I'm a little bit confused. I'm sorry. I'm just saying that they're readily available in all of the briefs. They're cited, and I would say they are in the record. I mean, they're available online. That's correct. Okay. I can go see what the — That's right. It's Section 5.8, Roman numeral V, subsection C, which is — Excuse me. 5.8. Section 5.8, Roman numeral V, subsection C. There's actual personal housekeeping tasks. And if I just can finish the other two. So there's making your bed, keeping the floor around you in your immediate living area free of debris and clutter, refraining from hanging up hangers on dividers, and stacking loose papers. Those are the personal housekeeping tasks that ICE says CoreCivic can require people to do. That doesn't run afoul of the forced labor provisions of the TVPA, because that's not the labor — And you don't claim that those standards violate the TVPA? No, not at all. And that's not a part of this case. Okay. I think my time is up. And help me one more time. Those standards are referenced in the contract between the government and the appellant here. Yes, Your Honor. Okay. It is undisputed that they follow them, and they must. Okay. So when we look at the basic threshold question of whether a private contractor operating a detention center can be subject to the TVA, it can only be subject to the TVA if it violates it, right? I mean, part of being subject to it is that there's forced labor going on. There's no forced labor going on. That's a coverage question. One of the limiting principles in this statute is that it has to be forced labor. I think that's right. So it's only subject to it to the extent there's forced labor. Would you agree with that? I think that's correct as to liability, yes. Just to button up what you've said, and then I really thank the Court for its time. The personal housekeeping requirements of the PBNDS, just to clarify, are not part of the work program. So that's why that's not before this Court. The plaintiffs' appellees would respectfully request the personal housekeeping requirements of the PBNDS are not part of the work program. They're separate. Before you sit down, I want to end where we began with what we have in front of us. I was looking again at the amicus brief of the United States, and they may have a different view on this than you, but they make two arguments. The first argument they make on page six of their brief is very clear. It says the TVPA applies to federal contractors, including those operating immigration detention facilities. That looks to me to be the question that the district court was seeking to certify and that the motions panel certified. That's before us. Yes. That's easy. Yes. The second argument is what I want to ask you about. The second argument they make, it appears on page eight of their brief, and it says an immigration detention facility that operates in accordance with federal detention standards generally will not violate the TVPA. That strikes me as a merits question. I may have that wrong, and I want your help on understanding it. If it's a merits question that's different from the first question, ought we to be opining about it here? I do not believe you're wrong. I believe that this interlocutory appeal would be an improper place to develop this standard. That is to say to the extent the United States is asking us to say that the system that actually operates in detention facilities is in accordance with the federal detention standards and that that does not violate the TVPA is a merits question distinct from whether the statute covers in the first place immigration detention facilities and applies to federal contractors. I think you've put it exactly right, Your Honor. All right. I think maybe that comes from a concern by the United States that an overreach of the decision there. Sure. And they may be very correct. That may be clear and correct. Sure. But that's not the case. Speaking for myself, I have little doubt about that. Sure. I only am asking whether that's before us. It's not. McFarland says this Court — But you agree we can expand. That's right. McFarland says this Court can look at the other one. Whatever we see is necessary. In fact, you sit up here and say it's really not even necessary to do the whole question right now. Sure. You say the DOJ is weighed in, and we should decertify it. Did I hear that correct? You heard that correct. That's what we're asking to do. So we can decertify it. We can answer that question. We can make it clear that this contract doesn't violate it if we want to. You can do any of those things. But we're asking you to do your honors. And the government is just concerned if you don't put some limiting principle on it, you're going to have an open-ended statute. That's right. All I'm asking is whether that examination of that question goes beyond a purely legal question and would require some explication of the nature and extent of the program that they have authorized and that they run. Have I misapprehended that? You have not. I think you're correct. So if we address the second question, we're moving into at least a mixed question of fact and law.  You're absolutely right about that. Thank you. All right. But you asked an earlier question. You agree that with that second proposition that an immigration detention facility that operates in accordance with the Federal detention standards generally will not violate the DTVPA. You agree with that, right? In general, yes, Your Honor. Yes. I don't think it's before this Court on the certified question, but you asked, so I answered. Okay. So the Planned Safety Police would respectfully request that this Court dismiss this appeal and send it back to the district court, or in the alternative that it hold, that the simple question has a simple answer. Yes, the TVPA applies. Thank you for your time. Thank you. And we've given amicus five minutes for the United States. Yes, Your Honor. Good morning. Brad Henschwood, United States. Good morning. I'd like to begin exactly what I think the — where you left off, Judge Marcus and Judge Hull, which is, of course, we agree that the Court could simply answer the question of whether the term whoever covers Federal immigration detention facilities operated by private contractors. And as you pointed out, our answer to that question is yes. Now, we do believe that the way that the standard, the way the statute is applied in this context has to take account of the circumstances that are inevitable in any sort of detention facility. And so that's what the arguments in the second part of our brief do. Let me ask you — let me ask you sort of a prefatory question. Your colleague at the Lee says we shouldn't hear anything. We should send the whole thing back, even though he concedes it's a discrete question of law. What's your position on that? Your Honor, I think that's obviously within the discretion of the Court under the — It surely is. But would you have us answer the question, at least the question the district judge certified or not? Your Honor, I don't know that we have a particular concern one way or the other. I mean, certainly to the extent the Court is going to answer the question, we wanted to make clear our view that it does cover, you know, facilities of this type, precisely because, as you've pointed out, and as I believe CoreCivic was pointing out in its time, the government also criminally prosecutes the statute and wants to ensure that the Court, you know, in the event it does address the question, doesn't adopt an unduly narrow reading of the statute. Well, isn't the government saying that if you're planning to go ahead and bring criminal actions, it would be helpful to have a circuit opinion on this? Isn't the government of that opinion? I mean, isn't that what you're asking? Certainly to the extent that the Court wants to, you know, answer this question and make clear that there is no doubt that the government's position on that question is correct, we would welcome a ruling of that type, but, you know, we're not as an amicus particularly. I'm curious. You can help me. Has the United States prosecuted anybody for a violation of 1589 forced labor in this context in a facility, a detention facility? I'm not aware of such a prosecution, Your Honor, and, you know, but nevertheless, I think we'd want to ensure that, you know, in the event you actually have a position Your position is that you could. Of course. To the extent that a detention facility was being run in a way that, you know, forced individuals to labor under the threat of serious harm or one of the other prohibited means under the statute, you know, obtained labor services by one of the prohibited means under the statute, then, of course, the government would want to be in a position to bring criminal charges as appropriate. But at the same time, Your Honor, we believe that the statute also has to be understood and that the scope of the liability has to be understood to give effect to Congress's intent both to have immigration detention generally and to have work programs in those facilities. And so, you know, to the extent the Court goes beyond the sort of narrow question that I think, you know, you've been describing, Your Honor, then we want to make sure that the Court doesn't, you know, inadvertently or otherwise adopt the statute. That's how I read your brief. You said if you answer the question, you need to – whoever – there's a whoever question. Don't limit it to whoever. Make it clear that it has to be – the scope of the coverage is only to force labor per the terms of the statute. And I have the same quote Judge Marcus just read. Your argument was that the Court should make it clear that the facility that operates in accordance with the Federal detention standards generally will not violate it. That you ask us to put that in the opinion, so to speak. Certainly, you know, we believe that's the correct understanding of the interaction between the TVPA and the standards at issue here. And that the – you seem more concerned with the opinion not calling into question the general legality of voluntary work programs. I'm sorry, Your Honor. I didn't hear your question. I'm just reading from your brief. The opinion needs to make clear that it does not call into question the general legality of voluntary work programs. Right. We would certainly appreciate to the extent the Court is opining on the way that the standard operates in this context, that it makes clear that — Let me ask you, but you want us to opine about a particular voluntary program run by the United States in detention facilities, right? Your Honor, the point is that the program as sort of operated in accordance with the PB&DS and the sort of detention facilities — I guess what I'm asking is how do we do that with mining down into some kind of factual data? Your Honor, I think at least as to some of those questions — I mean, there's no question the statute is clear as a bell, and it requires — it would not state a crime and it wouldn't state a claim for a civil violation regardless of whoever is, regardless of what a person means, unless there was force, threats of force, physical restraint, violence, serious harm, or threats of serious harm or abuse of some kind. Whoever runs the facility would have to engage in that kind of misconduct before they would be liable either civilly or criminally. But that's clear from the terms of the statute. But it seems to me what you're asking us to do is to say this program that we run, ourselves sometimes, with surrogates sometimes, doesn't violate the statute. And I don't know how we can do that without drilling into the nature and extent of the program. It may — I have little doubt that it's voluntary. I can't imagine that it's run in any other way. But I don't have any data from the district court on that question. I don't have any discovery. There's nothing before me on that, I think. And so I'm just asking, how do I go about doing that other than to stay at a high order of abstraction that in order to state a crime or in order to be liable for a civil remedy, forced violence or threats have to be used? That is self-evident from the statute. But how do I then say, and this program that they run doesn't run afoul of this language without knowing what this program is and how it operates? That's the trouble I'm having. And let me add to that, because I think what you really — I hope what you're really asking, what your real concern is, is that the Court not go beyond the certified question and not in some way imply anything about the legality of voluntary work programs. If this Court were to just stick with the certified question, wouldn't that really satisfy the government's position? Right, Your Honor. I think that's exactly right. Part of the concern here is that we wouldn't want the Court inadvertently or otherwise to say something in answering the question that would, you know, call into doubt these programs that, you know, are operated in facilities across the country and have explicit congressional authorization. If we were to say no more than we offer no opinion about whether these programs that the United States run has any validity or invalidity or is in any way run in a manner that violates the statute, that accomplishes your objective? I think so, Your Honor. The only point we're trying to make, I think, in the latter part of the brief, is just to make clear that, you know, because Congress has authorized these programs and because DHS has promulgated standards for these programs, it does not count. But you're not really asking us to comment on that. You just want to be sure we don't say something that will create a new problem back at the district court. Correct. And to the extent this Court opines on the correct standard for applying a TVPA claim, you know, we've laid out some thoughts about how the standard ought to apply in this Obviously, that's not a concern that we have. All I'm asking is, can I reach that question without drilling down into facts that I don't have? Your Honor, I think we've advanced some points about how the statute operates, including with some specific examples related to the housekeeping requirement, related to work stoppages, related to the ---- But how do I know whether that's right or wrong without anything from the ---- Your Honor, you could certainly permit the district court to conduct that analysis in the first instance. You know, we think it's just a matter of comparing, you know, the statute and background principles to the complaint. Right. But you're entirely within your rights to ask the district court to do that in the first place. All right. Thanks very much. Thank you, Your Honors. To be clear, the Court can answer this second question, and it absolutely should answer the second question. How can we answer the second question when we don't have any factual record before us at all? Well, we've got the allegations. We can take those allegations as true. If you look closely at the allegations, what the plaintiffs are alleging fall squarely within the PBNDS. They allege that they were threatened or actually placed in solitary confinement because they threatened a work stoppage. That has nothing to do ---- That is not found in Section 5.8 of the Voluntary Work Program. That is a separate disciplinary section in the PBNDS. That doesn't even implicate the VWP. That is the core of their claim, is that they were threatened solitary confinement if they threatened others to stop working. That's one. Two ---- Well, that wasn't the complete allegation. You're talking about starting in the middle with the allegation. The original of the allegation was that they wanted a work stoppage because they were made to work involuntarily. And how we would in any way get into that without additional factual information ---- How could we do that? I don't know if it's clear from the complaint that the reasons for the work stoppage ---- If you just look at the allegations by the three individual plaintiffs, they just blanketly assert that they were threatened because they encouraged others to stop working. Well, but of course the allegations go beyond that. Among other things, Barrientos alleges that he was denied access to personal hygiene items and they weren't replenished unless and until he otherwise complied with these work requirements. So that allegation goes beyond maybe wholly false. But that allegation says more. That's correct. Barrientos does make an allegation that he was coerced because I think he said that he didn't get a roll of toilet paper on one occasion when he asked for it. Therefore, he had to join the voluntary work program. Right. But as you pointed out, he also alleges that he was threatened with solitary confinement because he threatened others or he encouraged others to engage in a work stoppage. Also, there's vague allegations that they were threatened for refusal to work. And it's unclear from the complaint whether that was refusing to perform their jobs while in the program or, for example, they refused to clean up after themselves in the common living area or refused to clean their cells. It's unclear. And it's critical that the Court at least create this safe harbor in this decision, creates a safe harbor. All three parties you've heard from today agree that compliance with the PBNDS is the TVPA does not reach into that. And that's absolutely necessary because when we go — if you just answer the question as certified, whether it applies to a work program, that really doesn't get us far when we go back. My question is, well, you say it doesn't apply to a detention, an immigration detention facility at all. And that's our primary argument. And you say it doesn't apply to a detention facility in particular run by a private contractor. Right? Whether it's a private — Or does that make no difference? It makes no difference if it's us, if it's another — So the bottom line is simply you say this statute doesn't cover what you do or what the United States does on its own. That's correct. It does not reach within the confines of a custodial detention setting. Okay. But if we just — if you just answer the question — Well, let's assume it does because of the language. Okay. I'm not sure I understand what you're saying about a safe harbor. You said it should say compliance with what? Compliance with the Federal standards, the performance-based national detention standards. Performance-based — National detention standards. And that's referred to in your contract? Correct. The contract incorporates — requires CoreCivic to comply with the PBNDS. We've hyperlinked those throughout our briefs. They're incorporated through the complaint. They're easily — Of course, that isn't part of the question that was certified to us by the district court, right? I think the district court-certified question, it does. It's narrowed to work programs. But as we've talked about, we can go beyond that. I think it's absolutely necessary that we do. I think it was unnecessarily limited. As you pointed out, I mean, it begs the question, if it's voluntary, then that really doesn't get us anywhere. If it's voluntary and you comply, then there's no forced labor. So answering that very narrow question doesn't move the ball too far once we go back. But that's the question you're arguing the statute doesn't cover. Well, we're arguing that because the statute doesn't apply at all in this context, it does not apply into the implementation of a voluntary work program. But there's the voluntary work program, and then there's other labor that is required while in custody, personal housekeeping, maintaining common areas. The PBNDS would — So why shouldn't we just identify questions for the district court to answer on remand like what you just said? We just say the TP, it does cover your client. It falls within whoever. But we recognize their — the scope of the coverage. There are other coverage issues. And send it back to the district court. Let the district court answer all this so we have all these issues teed up at a later time. And then you'll have discovery about all that. Why wouldn't — I mean, if we just identified for the district court, the parties have argued about whether as long as they comply with the PBNDS, that wouldn't fall out. That's a question for the district court in the first instance. Rather than us getting into all that. Well, a few reasons. One, I think the district court would appreciate the precedential guidance that the court can provide. Two, as I mentioned — Then why didn't he ask us to do that? For the precedential value. Why did the district court limit the question that it certified to simply whether the TVPA applies to work programs in Federal immigration detention facilities operated by private for-profit companies? He could have said more. Maybe he should have. He could have added the thing that you're adding now. He could have added what the United States would like us to address, or at least in its brief suggested that we should. But he wasn't looking for the circuit's help on that question on an interlocutory basis, was he? Well, the order in its entirety on this question was very brief. I mean, it was plain language, in and out. It didn't go delve into anything else. But it was pretty — it was pretty focused like a bullseye on one question, whether this statute does or does not cover Federal immigration detention facilities. Right. Or any of the labor that — And the battle was, given its breadth, it looks like it does. And your answer is, that may be true at a higher order of abstraction, but it completely misapprehends what Congress was about. And we shouldn't extend the coverage. We should limit it to something more discreet and associated with human trafficking. But that was the question I thought that the judge was seeking to get the circuit to rule on. As stated, that was the question. But when you delve into the question, as we've talked about today, where do you draw that line? Right. So your answer is, if you're going to answer that question, then you should go the next step and answer this question, too, notwithstanding that he didn't ask us to do that. That's all I'm getting at. I think that that's critically important because we'll go back, and before the Court are still the allegations, the majority of which, virtually all of them, fall outside of this certified question. And then we're back here months or years from now when right now— Well, but then you'd move for summary judgment and you'd say, to the extent we do A, B, C, D, and E, it's covered by the PBNDS and therefore cannot state a claim for violation of the TVPA. And he'll rule on that question. And then what would be left is just that discreet portion of the complaint that arguably goes beyond, right? Well, right. Why isn't that the appropriate way and the way we would normally address this kind of problem? I don't think the District Court is in any more of a uniquely situated position than this Court to answer it. I think it would be more efficient if this Court simply answered it. The case has stayed until this Court issues a decision. It would exponentially increase or, I'm sorry, exponentially reduce the time in which this case comes to a resolution if we can set some ground rules, if we look at the allegations and apply it to the Court's holding so the District Court knows what the guideposts are. If the District Court really felt that that would advance the litigation so substantially, don't you think he would have expanded the question? I mean, we're faced with a very discreet question. What does this statute cover? What doesn't it cover? Not getting into the allegations of the complainant, which of them hold up and which of them don't hold up, that's a question the District Court is going to take some time for the District Court to answer it. But for us to answer, we don't even have enough information to go on, do we? Well, there's one way in which the work stoppage allegation is connected to the voluntary work program and the certified question is stated, and that's because the work stoppage encouraging others to stop working, it's those in the voluntary work program. So at least answering that question, whether if we're in compliance, if we discipline one of these plaintiffs, sanction them with solitary segregation because they did encourage others who are in the work program to stop working, does that violate the TVPA? I mean, that's one other reason why it's critical to at least take that extra step, because at least those allegations that involve encouraging others to stop working or encouraging others to refuse to work in their jobs as VWP volunteers, that does implicate the work program. And we do need that guidance so when we go back, we're not starting over from scratch and dragging this lawsuit out any longer than it needs to be. I think we've got your case. We thank you very much. We thank you, counsel. And we will move on to the next case this morning, which is